AES:MEB/AS
F. #2018R00035

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

STEVEN NERAYOFF and
MICHAEL HLADY,
    also known as "Michael Peters,"

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

COMPLAINT AND AFFIDAVIT
IN SUPPORT OF APPLICATION
FOR ARREST WARRANTS

(18 U.S.C. § 1951(a))

19-M-830

EASTERN DISTRICT OF NEW YORK, SS:

        JORDAN R. ANDERSON, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation, duly appointed according to law and acting as such.

        Upon information and belief, in or about and between June 2017 and November 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEVEN NERAYOFF and MICHAEL HLADY, also known as "Michael Peters," together with others, did knowingly and intentionally conspire to obstruct, delay and affect commerce, and the movement of articles and commodities in commerce, by extortion, in that the defendants and others agreed to obtain property, to wit: virtual currency of a business, from individuals with their consent, which consent was to be induced by wrongful use of actual and threatened force, violence and fear, including fear of economic loss.

        (Title 18, United States Code, Section 1951(a))

The source of your deponent's information and the grounds for his belief are as follows:[1]

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and am one of the law enforcement agents with primary responsibility for the investigation of this case. I have been a Special Agent with the FBI since 2016. Prior to joining the FBI, I earned a bachelor's degree in accounting, a master's degree in professional accounting and a license as a certified public accountant in Louisiana and Texas. I also worked as a financial statement auditor for a global accounting firm based in the United States. I am currently assigned to a squad within the FBI responsible for investigating complex financial crimes, including crimes involving wire fraud, bank fraud, securities fraud, money laundering and other white collar crimes. As a part of my work at the FBI, I have received training regarding these types of fraud and other white collar crimes.

2. I have personally participated in the investigation of the offenses discussed below. I am familiar with the facts and circumstances of this investigation from (a) my personal participation in the investigation, (b) reports made to me by other law enforcement authorities, (c) interviews with various individuals, (d) my review of publicly-available information, and (e) my review of documents, including agreements, communications and subpoenaed records, among other sources of evidence.

---

[1] Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware. In addition, where the contents of documents, or the actions, statements and conversations of others are reported herein, they are reported in sum and substance and in part, except where otherwise indicated.

I.   The Defendants and Relevant Individuals and Entities

3.   The defendant STEVEN NERAYOFF was a resident of Great Neck, New York. NERAYOFF was an attorney and the founder and Chief Executive Officer ("CEO") of Alchemist, LCC ("Alchemist"), a company that purported to be a leading consultancy, accelerator and investment firm for high-potential blockchain companies. NERAYOFF also controlled an entity called Maple Ventures LLC ("MV"), and an entity bearing the initials of his name, SDN LTD ("SDN").

4.   The defendant MICHAEL HLADY, also known as, "Michael Peters," was a resident of Hicksville, New York. In or about and between the end of 2017 and November 2018, both dates being approximate and inclusive, HLADY was hired by the defendant STEVEN NERAYOFF to be a consultant to Alchemist, and to perform functions similar to a Chief Operations Officer. HLADY used the alias "Michael Peters." At various times, he also falsely claimed to be a former member of the United States military and a former government agent who had worked for the National Security Agency, the Federal Bureau of Investigation and the Central Intelligence Agency.

5.   "Company 1," the identity of which is known to me, is headquartered in Seattle, Washington. Company 1 is a mobile-based business that specializes in generating user traffic to clients' products by issuing rewards in the form of cryptocurrency tokens.

II.  Relevant Terms and Definitions

4.   Based on my training and experience and information I have learned during this investigation, I am familiar with the following terms:

5.   An "Initial Coin Offering" ("ICO") or "crowdsale" was a fundraising event during which an entity offered participants a unique "coin" or "token" in exchange for

consideration. The tokens or coins were generally issued on a "blockchain" or a cryptographically secured ledger. The tokens or coins were often paid for in "virtual currency." ICOs were typically announced and promoted through the internet and email. Issuers usually released a "whitepaper" describing the project and the terms of the ICO. To participate in the ICO, investors were generally required to transfer funds to the issuer. After the completion of the ICO, the issuer distributed its unique coin or token to the participants. The coins or tokens might entitle holders to certain rights related to a venture underlying the ICO, such as rights to profits, shares of assets, rights to use certain services provided by the issuer and/or voting rights. These coins or tokens might also be listed on online platforms, often called virtual currency exchanges, and might be tradable for virtual currencies.

6. "Pre-seed funding" was a fundraising event offering investors an early investment opportunity, which could include equity or debt investments into a new company.

7. A "presale" or "Pre-ICO" was a fundraising event that occurred prior to an ICO. It typically targeted specific investors.

8. "Virtual currency," also known as "a digital asset" and "cryptocurrency," was a digital representation of value that could be digitally traded and functioned as (a) a medium of exchange; and/or (b) a unit of account; and/or (c) a store of value, but did not have legal tender status. In other words, virtual currency was not issued by any jurisdiction and functioned only by agreement within the community of users of that particular currency. Examples of virtual currency were Bitcoin and Ether ("ETH").

9. A "blockchain" was a type of distributed ledger, or peer-to-peer database spread across a network, that recorded all transactions in the network in theoretically unchangeable, digitally-recorded data packages called blocks. Each block contained a batch of

Case 1:19-mj-00830-RER   Document 1   Filed 09/17/19   Page 5 of 12 PageID #: 18

5

records of transactions, including a timestamp and reference to the previous block, linking the blocks together in a chain. The system relied on cryptographic techniques for secure recording of transactions.

10. Ether was generated on the Ethereum blockchain, which was an open-source, public, blockchain-based distributed computing platform and operating system featuring smart contract functionality. Ether could be transferred between accounts and "Ethereum Wallets."

11. An Ethereum Wallet was a gateway to decentralized applications on the Ethereum blockchain, which permitted the holder of an Ethereum Wallet to hold and secure Ether and other virtual currencies built on Ethereum, as well as to write, deploy and use smart contracts. I understand that each Ethereum Wallet had its own unique identifier known as an "address."

12. A "smart contract" was a computer program designed to execute the terms of a contract when certain triggering conditions were met. Blockchains or distributed ledgers could record smart contracts.

III. The Extortion Scheme

13. On or about July 22, 2017, John Doe and Jane Doe, respectively CEO and Chief Operating Officer of Company 1, signed an agreement (the "July 2017 Agreement") with MV, the defendant STEVEN NERAYOFF's company. The July 2017 Agreement, among other things, required MV to do the following: (1) revise Company 1's whitepaper; (2) add advisors and strategic partnerships for Company 1 to ensure a "successful crowdsale"; (3) source and curate pre-seed funding from "strategic partners in the blockchain community"; (4) assist Company 1 with its sale method and network connection; and (5) complete Company 1's

"crowdsale in a successful/compliant manner." In exchange for MV's services, Company 1 was required to provide MV with 22.5% of all the cryptocurrency tokens sold by Company 1 and 22.5% of all the funds raised by Company 1, including in the form of cryptocurrency and cash, "regardless of the method and manner in which [the funds] are raised."

14. After MV and Company 1 signed the agreement, the defendants STEVEN NERAYOFF and MICHAEL HLADY took various actions to threaten John Doe, Jane Doe and Company 1 in order to extract additional compensation without promising or rendering any additional services, as detailed below.

A. The First Extortion: 30,000 ETH

15. Company 1's crowdsale was scheduled to begin on November 7, 2017.

16. The defendant STEVEN NERAYOFF told John Doe and Jane Doe that MV raised a total of approximately 55,677 ETH during the pre-sale period on behalf of Company 1. Pursuant to the July 2017 Agreement, MV was entitled to 22.5% of the 55,677 ETH raised, or approximately 12,527 ETH.

17. On or about and between October 30, 2017 and November 6, 2017, the defendant STEVEN NERAYOFF and a co-conspirator ("Co-Conspirator 1") contacted John Doe and Jane Doe and demanded that Company 1 agree to let MV keep 30,000 ETH (worth approximately $8.75 million on November 7, 2017) that it had been holding from the pre-sales. NERAYOFF stated, in sum and substance, that if John Doe and Jane Doe did not agree, then NERAYOFF would, among other things, sabotage the crowdsale, generate negative press for Company 1 and use his contacts with influential people to "destroy" Company 1. NERAYOFF told John Doe, in sum and substance, that John Doe had a choice: NERAYOFF could keep all

the pre-sale funds raised and destroy Company 1, or Company 1 could sign two agreements that he sent.

18. On or about November 6, 2017, the defendant STEVEN NERAYOFF sent an email to John Doe and Jane Doe, with the subject line, "Please sign ASAP," and attached two agreements that sought to provide additional compensation to NERAYOFF. On or about November 7, 2017, Jane Doe and NERAYOFF executed the two agreements.

19. The first agreement, titled "Services Payment Agreement," stated that, "Company 1 wishes to compensate Nerayoff if the Crowdsale is successful." The agreement provided, in sum and substance, that if Company 1 raised 60,000 ETH during the pre-sale and crowdsale periods, then the defendant STEVEN NERAYOFF would be entitled to 1.35 billion of Company 1's tokens and 30,000 ETH (or equivalent cryptocurrency). The Services Payment Agreement further provided that if Company 1 raised 120,000 ETH, then NERAYOFF would be entitled to an additional 6,000 ETH. Under the agreement, NERAYOFF was also entitled, with no pre-conditions, to 900 million Company 1 tokens two years after the token sale. A provision in the Services Payment Agreement also stated that it was a material breach for the agreement to be disclosed to any third party.

20. The second agreement, titled the "Nominee Agreement," was also executed on or about November 7, 2017. It provided that Company 1 "Directs Nerayoff to transfer [30,000 ETH or the equivalent in cryptocurrencies] to the persons listed on Schedule A hereof upon completion of the Crowdsale." The only individual or entity listed on Schedule A was SDN, an entity controlled by the defendant STEVEN NERAYOFF. The Nominee Agreement further provided that its terms "shall remain confidential."

21. Between approximately November 7, 2017 and approximately December 8, 2017, Company 1's crowdsale raised approximately another 20,000 ETH for Company 1. As a result, a total of approximately 75,677 ETH was raised for Company 1 during the pre-sale and crowdsale periods. Based on the original July 2017 Agreement, the defendant STEVEN NERAYOFF would have been entitled to approximately 17,027 ETH as payment for MV's services during these periods. However, pursuant to the Services Payment Agreement, NERAYOFF kept 30,000 ETH. The additional approximately 13,000 ETH that NERAYOFF kept as a result of the Services Payment Agreement was valued at approximately $3.78 million on November 7, 2017.

22. At the conclusion of Company 1's crowdsale, 1.3 billion of Company 1's tokens still remained unsold. On approximately December 1, 2017, Company 1 incentivized users of Company 1 tokens and participants in the crowdsale to retain the Company 1 tokens by promising to distribute any unsold tokens to them. Despite not being eligible to receive these tokens, between approximately December 2017 and May 2018, the defendant STEVEN NERAYOFF demanded 1 billion of the unsold tokens from Company 1, before revising his demand to 350 million tokens.

B. The Second Extortion: the 10,000 ETH "Loan"

23. In approximately March 2018, the defendant STEVEN NERAYOFF demanded that Company 1 give him a purported loan for 10,000 ETH (valued at approximately $4.45 million on March 28, 2018). Around that same time, NERAYOFF introduced the defendant MICHAEL HLADY to John Doe and Jane Doe. NERAYOFF stated, in sum and substance, that HLADY was his "operations guy," whom they should view as the president of Alchemist. NERAYOFF also told John Doe and Jane Doe that HLADY was a former

government agent who could carry firearms through airports. On separate occasions, HLADY told Jane Doe, in sum and substance, and among other things, that he had been shot at and had killed people, that he had "taken down" a head of state, and that he had been a part of the Irish Republican Army, the National Security Agency, the Central Intelligence Agency and the Federal Bureau of Investigation. The email address from which HLADY would email John Doe and Jane Doe had an Alchemist domain.

24. Between March 20, 2018 and March 23, 2018, both dates being approximate and inclusive, Jane Doe visited the defendants STEVEN NERAYOFF and MICHAEL HLADY at NERAYOFF's home in Great Neck, New York. Due to a snowstorm, Jane Doe was unable depart New York on a flight as scheduled. Instead, Jane Doe stayed at NERAYOFF's house on the evening of March 21, 2018, and through March 22, 2018.

25. In the middle of the night, on approximately March 22, 2018, the defendant MICHAEL HLADY walked into the room where Jane Doe was sleeping by herself. HLADY turned on the lights, pulled a up a chair to the bed where Jane Doe had been sleeping and told Jane Doe, in sum and substance, that if Company 1 did not agree to his demands, which included, among other things, a demand for $10,000,000 and a large amount of Company 1 tokens, then "we will crush you," by, among other things, driving down the price of Company 1's tokens. At some point later that night, the defendant STEVEN NERAYOFF also entered the room. He told Jane Doe, in sum and substance, that he would destroy her and Company 1, but that he did not want to, and asked Jane Doe if she wanted to, in sum and substance, thrive or be destroyed. Shortly thereafter, NERAYOFF and HLADY demanded that Company 1 provide a purported 10,000 ETH loan to NERAYOFF.

26. On other occasions, the defendants STEVEN NERAYOFF and MICHAEL HLADY made additional threats to Jane Doe and John Doe. For example, HLADY told Jane Doe he was aware of her work-related issues at a different company, and knew where her child went to school. NERAYOFF and HLADY also threatened to expose Company 1 to potential litigation.

27. Between approximately March 27, 2018 and March 28, 2018, as the defendant MICHAEL HLADY was moving through John F. Kennedy International Airport to fly to Cancun, Mexico, HLADY sent a series of "iMessages" to Jane Doe primarily regarding the loan. One of the messages that HLADY sent to Jane Doe said the following, in sum and substance:

> [Jane Doe] fix this by the time I land or I promise I will destroy your community. (1) we will go public with Stevens holding. (2) we will sell and get everyone we know to sell. (3) we will sue you. (4) a story will be written about [Company 1]. You are stalling for stalling's sake. I will be landing in 4hrs I expect you and [John Doe] on the phone. Also I want the "manual" you wrote today!!

28. As a direct result of these threats, on or about and between March 28, 2018 and April 1, 2018, John Doe instructed a Company 1 employee to transfer 10,000 ETH to the defendant STEVEN NERAYOFF as a loan. Despite repeated requests in approximately May 2018 through August 2018 to NERAYOFF and the defendant STEVEN HLADY, NERAYOFF refused to pay back the 10,000 ETH loan.

C. Other Threats

29. The defendant STEVEN NERAYOFF also made clear to Jane Doe that he wanted to acquire Company 1. On or about May 10, 2018, NERAYOFF wrote an email to HLADY and Co-Conspirator 1, which stated in part:

> Something has to be done to explain when they [i.e., Jane Doe and

>John Doe] make a deal they stick to it regardless of the consequences. And then when we renegotiate they stick to that deal. Enough is enough. We are acquiring them and going to make them fucking rich as hell and she [i.e., Jane Doe] will pay off everything and get what she would never have without us so tell her to chill out. We will blow them out as a protocol and they will be part of Alchemist.

30. On approximately May 15, 2018, John Doe and Jane Doe attended a meeting in a hotel room in New York City, with the defendants STEVEN NERAYOFF and MICHAEL HLADY, along with Co-Conspirator 1 and other individuals working for NERAYOFF. During the meeting: (1) NERAYOFF confirmed that he knew of HLADY's threat to "destroy" Company 1; and (2) one of NERAYOFF's employees stated that they were running an "intervention" with NERAYOFF, and that with exception of NERAYOFF, they were not "ganging up" on Jane Doe and John Doe.

III. Conclusion

WHEREFORE, your deponent respectfully requests that arrest warrants be issued for the defendants STEVEN NERAYOFF and MICHAEL HLADY so that they may be dealt with according to law.

IT IS FURTHER REQUESTED that, because public filing of this document at this time could result in a risk of flight by the defendants, as well as jeopardize the government's

12

investigation, all papers submitted in support of this application, including the complaint and arrest warrant, be sealed until further order of the Court.

*[signature]*
JORDAN R. ANDERSON
Special Agent, Federal Bureau of Investigation

Sworn to before me this
17th day of September, 2019
by telephone

_____
THE HONORABLE RAMON E. REYES, JR.
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK